```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
  UNITED STATES OF AMERICA,                                 :
                                                            :   MEMORANDUM DECISION AND
                    -against-                               :   ORDER
                                                            :
  DERRICK AYERS, et al.,                                    :   20-cr-239 (BMC)
                                                            :
                            Defendants.                     :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

This Order addresses defendant Franklin Gillespie's [1545] objections to the Government's proposed expert witnesses.[1]

## I.  Andrew Walker

According to the Government's briefing, Mr. Walker intends to testify about trafficking K2 (a synthetic cannabinoid) into and within Rikers Island correctional facilities. The Government argues that this information is necessary for the jurors to understand the charged conduct, as the average juror does not know about the specific methods used to smuggle K2 into prison and sell it there, including soaking papers in liquid K2, drying them, and sneaking those dried papers into prison for distribution. Mr. Gillespie responds that Mr. Walker is not qualified to testify about several of his proposed topics (including information regarding drug quantities), his testimony is not specialized and impermissibly mirrors the theories of the Government's fact witnesses (of which he is one), and he will serve as a mouthpiece for testimonial statements of non-testifying witnesses and other hearsay.

The Government's initial description of Mr. Walker's proposed testimony – as outlined in its expert disclosures and opposition to Mr. Gillespie's motion – raised serious concerns about

---

[1] Co-defendants Derrick Ayers and Anthony Kennedy join in Mr. Gillespie's motion.

that testimony's admissibility. Testimony about "drug smuggling and trafficking of synthetic cannabinoids on Rikers" would veer dangerously close to simply "mirror[ing] the testimony of the Government's fact-witnesses," which "implicitly encourage[s] the jury to draw the Government's preferred inferences." See United States v. Rijo, 508 F. App'x 41, 44-45 (2d Cir. 2013). It also appears that those opinions might be informed by interviews Mr. Walker conducted with Rikers inmates (i.e., confidential informants). Although an expert is permitted to rely on hearsay and other inadmissible evidence to the extent that "experts in the[ir] particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," see Fed. R. Evid. 703, Mr. Walker cannot recite specific statements made by other inmates accusing defendants of criminal conduct. That testimony would implicate defendants' rights to confront their accusers, since such statements constitute testimonial evidence. See United States v. Mejia, 545 F.3d 179, 198 (2d Cir. 2008); see also United States v. Rios, 830 F.3d 403, 418 (6th Cir. 2016).[2]

However, after this motion's briefing, the Government, in open court, substantially narrowed the scope of Mr. Walker's proposed testimony to just three issues. First, he will provide background testimony about the use of K2 in prison limited to information about quantity, pricing, and slang terminology. Second, he will testify about how K2 is soaked into paper as a method of smuggling it. And third, he will testify as a fact witness about the phone system, mail system, visitation procedures, and layout at Rikers. This carefully circumscribed testimonial scope steers clear of the aforementioned concerns.

As to the first category of evidence, he will be permitted to testify about pricing, quantity,

---

[2] The Government responds that Mr. Walker "did not conduct the investigation of these defendants, so he would not be privy to witness interviews conducted as part of this case," but that does not change the fact that he conducted interviews with confidential informants who may have provided testimonial statements about defendants. It would run afoul of defendants' Confrontation Clause rights for Mr. Walker to introduce such testimonial hearsay at trial.

and terminological issues pertaining to K2, as this information is beyond the ken of the average juror and it appears that Mr. Walker's "experience conducting hundreds of investigations into contraband" qualifies him to testify as an expert as to these issues. Second, that same experience qualifies him to testify about the K2 paper-soaking method, so he may provide expert testimony about how paper can be used to smuggle K2 into prison as a general matter, so long as his foundation for that knowledge is not testimonial hearsay.[3] But he may not testify as an expert about how Rikers inmates specifically smuggle K2 into prison, as that would impermissibly mirror the Government's precise allegations against defendants in this case. Finally, his testimony as a fact witness is permissible so long as he limits that testimony to what he has personally observed.

## II.    Alfred Hernandez

Mr. Hernandez intends to testify about drug types, quantities, stash houses, and other issues pertaining to drug trafficking. Mr. Gillespie argues that his testimony should be excluded because it will impermissibly overlap with fact witness testimony. He also claims that the Government's disclosures are insufficient under Rule 16.

The Government responds that Mr. Hernandez's testimony will minimally overlap with fact witness testimony. Whereas the fact witnesses will testify specifically about the Bully Gang's alleged narcotics trafficking, Mr. Hernandez will testify generally about the process of making and selling drugs, typical drug prices, and other information that will provide helpful background to the jury. The Government correctly notes that some degree of overlap with fact testimony is permissible. See United States v. Abarca, No. 19-cr-3751, 2021 WL 6803226, at *5

---

[3] The fact that Mr. Walker has never testified about this information is, of course, fair game for cross-examination. If it becomes clear during his direct examination that he lacks the appropriate background to provide expert testimony about the K2 paper-soaking method or that his knowledge is limited to testimonial hearsay, the Court will preclude such testimony.

3

(2d Cir. Dec. 15, 2021).

The Government further responds that its supplemental disclosure is sufficient because it provided a detailed recitation of the facts about which Mr. Hernandez will testify and the other aspects of drug dealing that he intends to discuss. According to the Government, this disclosure is sufficient under Rule 16 and is more thorough than the disclosure that was deemed improper in United States v. Mrabet, No. 23-cr-69, 2023 WL 8179685 (S.D.N.Y. Nov. 27, 2023), which Mr. Gillespie cites in support of his argument.

I agree with the Government on both fronts. The supplemental disclosures satisfy Rule 16 by detailing the specific testimony that Mr. Hernandez intends to provide. As for admissibility, courts routinely allow experts to provide background information about drug dealing, as much of that information is beyond the ken of the average juror. See, e.g., United States v. Tapia-Ortiz, 23 F.3d 738, 741 (2d Cir. 1994). Therefore, the motion to preclude his testimony is denied.

### III. Konstantin Genin

Mr. Genin intends to testify about the makes and models of certain vehicles that were allegedly involved in defendants' crimes, which will support the Government's theory that those vehicles are the same as those that law enforcement seized and that were allegedly owned or used by defendants. Mr. Gillespie argues that the disclosure is insufficient under Rule 16 because it does not indicate that Mr. Genin used a reliable methodology in developing his opinion. Mr. Gillespie also argues that Mr. Genin is unqualified to provide expert testimony on vehicle identification and that his testimony is well within the understanding of the average juror.

The Government responds that the disclosures were sufficient because they explained Mr. Genin's methodology, which included reviewing nine aspects of cars and comparing those with

4

images and diagrams from manufacturers' brochures and other materials. The Government further argues that a lay juror is not able to identify the make, model, year range, or other aspects of a vehicle by simply observing a picture of that vehicle, so Mr. Genin's testimony is both specialized and helpful. As for Mr. Genin's qualifications, the Government states that he has spent 16 years with the NYPD and has been part of the highway patrol since 2013, and that much of his work involves identifying cars that flee the scene after causing an accident, which demonstrates his expertise in identifying a car's make, model, and other relevant information.

As an initial matter, the Government's disclosures about Mr. Genin are sufficient because they provide ample information about his background, methodology, and intended testimony. His investigative experience qualifies him to testify about the makes, models, and other relevant information about the cars in question. The average juror might not be able to look at pictures of two cars and say whether they are the same make or model, especially if the images are unclear or the vehicles have been obscured to hide their identity.

Therefore, it appears that Mr. Genin's testimony will turn on "technical … or other specialized knowledge" that will be helpful to the jury in deciding whether the cars used in the commission of crimes match the cars that the Government allegedly seized from certain defendants. Mr. Gillespie's motion is denied.

**IV.     Melissa Pasquale-Styles**

Dr. Pasquale-Styles intends to testify about Paul Hoilett's and Mike Hawley's causes of death, whom certain Bully Gang members allegedly murdered. Mr. Gillespie argues that Dr. Pasquale-Styles's testimony would violate defendants' Confrontation Clause rights under the Sixth Amendment, because a) Messrs. Hoilett's and Hawley's autopsy reports are testimonial; b) defendants have not had and will not have the chance to cross-examine the people who created

those autopsy reports; and c) Dr. Pasquale-Styles did not perform or oversee either autopsy. The Government responds that Dr. Pasquale-Styles reached "her own independent opinions" about the causes of death, based on her review of the file for each autopsy, and that the Government does not seek to introduce the original autopsy reports; therefore, Dr. Pasquale-Styles is not introducing any out-of-court statements, so her testimony does not infringe defendants' rights under the Confrontation Clause.

This dispute implicates a legal question that has been aptly deemed "perplexingly complex" – whether an expert witness may rely on and testify about documents prepared by others if the documents are "not themselves admitted as evidence." See Grove v. Carlin, No. 17-cv-306, 2020 WL 2045546, at *19 (D. Idaho April 28, 2020) (quoting Williams v. Illinois, 567 U.S. 50, 67 (2012)). In a line of cases including Crawford v. Washington, 541 U.S. 36 (2004), Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. 647 (2011), the Supreme Court held that certain forensic analyses are testimonial and, therefore, may only be admitted against a defendant if the defendant has the opportunity to cross-examine the people who conducted those analyses. In Williams, the Court sought to clarify the extent to which one expert can rely on and testify about another's testimonial forensic analysis when that analysis is not admitted as evidence. Unfortunately, the Court's 4-1-4 decision offers little clarity. See United States v. James, 712 F.3d 79, 95 (2d Cir. 2013) ("Williams does not, as far as we can determine, using the Marks analytic approach, yield a single, useful holding relevant to the case before us."); see also United States v. Pablo, 696 F.3d 1280, 1290 (10th Cir. 2012) ("the manner in which, and degree to which, an expert may merely rely upon, and reference during her in-court expert testimony, the out-of-court testimonial conclusions in a lab report made by another person not called as a witness is a nuanced legal issue without clearly

6

established bright line parameters, particularly in light of the discordant 4-1-4 divide of opinions in Williams").

Although the Supreme Court has not determined whether autopsy reports are testimonial, the Second Circuit has held that they are. In Garlick v. Lee, 1 F.4th 122, 132-35 (2d Cir. 2021), the Court held that autopsy reports are testimonial and, as a result, it is error to admit those reports through a "surrogate witness" who did not prepare them. Citing Garlick, Mr. Gillespie argues that it would violate the Confrontation Clause to permit Dr. Pasquale-Styles (the "surrogate witness") to testify about the autopsy reports that she did not prepare.

The Government does not seem to dispute that the original autopsy reports are testimonial. It instead argues that it will not seek to admit the original autopsy reports and, because Dr. Pasquale-Styles will not testify about the contents or the conclusions of the reports, her testimony will not introduce any out-of-court statements. This case therefore falls squarely into the Williams gap.

In the absence of clear guidance, lower courts have endeavored to resolve cases like this one through the pre-Williams framework, resulting in inconsistent outcomes. For instance, some courts have determined that testimony like Dr. Pasquale-Styles's is admissible because autopsy reports are not testimonial. Since the Second Circuit has held otherwise, those cases are not persuasive. Others have noted that "merely basing an expert opinion on testimonial statements is not problematic," Rios, 830 F.3d at 418, while recognizing that "an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." United States v. Vera, 770 F.3d 1232, 1237 (9th Cir. 2014) (cleaned up). These cases demonstrate that

the constitutional analysis turns at least in part on the extent to which the testifying expert develops an independent and otherwise reliable opinion about the underlying testimonial report. See United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009) ("The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem.").

In this vein, some courts have held that experts may permissibly rely on testimonial reports that they did not prepare so long as they reach an independent conclusion, even if that conclusion is based primarily on the testimonial report. In Huynh v. Lizarraga, No. 15-cv-1924, 2020 WL 1324826, at *33 (S.D. Cal. March 20, 2020), the court found no violation of the defendant's Confrontation Clause rights where an expert partially based her testimony on a medical examination report that she did not personally prepare, as the testifying expert developed an independent conclusion (even though it was influenced by photographs taken in the course of an examination that she did not conduct) and did not testify about the initial report's results or conclusions. And in King v. Kowalski, No. 11-cv-12836, 2020 WL 5768897, at *5 (E.D. Mich. Sept. 28, 2020), the court held that, assuming autopsy reports are testimonial, it would not violate a defendant's Sixth Amendment rights for an expert to rely on a testimonial autopsy report that the expert did not prepare so long as the testifying expert reaches "her own opinion and conclusions concerning the victim's cause of death."

On the other end of the spectrum, at least one court has held that it was error to admit an autopsy report through the testimony of a surrogate expert, even though the surrogate expert reached an independent opinion about the autopsy. See Diaz v. Bell, No. 18-cv-10121, 2022 WL 3371214, at *5 (S.D.N.Y. Aug. 16, 2022), aff'd sub nom. Diaz v. Miller, No. 22-cv-1835, 2023

WL 4363245 (2d Cir. July 6, 2023). Notably, the court held that admitting one of the surrogate expert's diagrams violated the confrontation clause, since the surrogate admittedly sought to "duplicate" a diagram from the original autopsy. This is consistent with the principle that an expert may not merely parrot the opinion of another – if that were permissible, the Government could create an end-run on the Confrontation Clause by finding new experts to reach "independent" (but identical) conclusions and testify about testimonial documents whenever the original analyst becomes unavailable, denying defendants the right to cross-examine their accusers.[4]

If you stare into the precedential abyss long enough, the following trend begins to emerge: to determine whether an expert may testify about independent conclusions that are informed by testimonial reports that the testifying expert did not create, courts consider, *inter alia*, 1) how much a testifying expert's conclusion is premised upon testimonial reports created by others; and 2) how the testifying expert refers to those testimonial reports at trial.

With respect to the first inquiry, if Dr. Pasquale-Styles reviewed material other than the testimonial autopsy reports in reaching her conclusion, then her testimony likely will not violate

---

[4] The Government states that "[u]nder Gillespie's theory, testimony regarding a murder victim's autopsy could never be admitted at trial where, for instance, the original medical examiner is deceased or where (as here) the original medical examiner no longer lives in the country. That, of course, is not the law." But the Government gives no reason why that "is not the law," nor does it cite any case law for that proposition. In fact, at least three Supreme Court justices have expressed concern that under the Court's Confrontation Clause jurisprudence, that is precisely the law. See Melendez-Diaz, 557 U.S. at 343 (Kennedy, J., dissenting) ("If for any reason the analyst cannot make it to the courthouse in time, then, the Court holds, the jury cannot learn of the analyst's findings (unless, by some unlikely turn of events, the defendant previously cross-examined the analyst). The result, in many cases, will be that the prosecution cannot meet its burden of proof, and the guilty defendant goes free on a technicality that, because it results in an acquittal, cannot be reviewed on appeal.") (cleaned up); Williams, 567 U.S. at 97–98 (2012) (Breyer, J., concurring) ("Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? Is the Confrontation Clause effectively to function as a statute of limitations for murder?") (cleaned up). Although these concerns do not inform my decision today, they underscore the need for post-Williams clarity regarding the extent to which an expert can permissibly rely on and testify about testimonial documents that the expert did not create.

defendants' Confrontation Clause rights even if she reached the same conclusion as the analysts who generated the autopsy reports. If, on the other hand, she relied exclusively and uncritically on those reports, her testimony should be excluded.

As for the second inquiry, it would be impermissible for Dr. Pasquale-Styles to testify that the underlying autopsy reports are accurate or that the analysts who prepared them followed proper protocol, as she lacks foundation for that testimony. It would also violate the Confrontation Clause if she told the jury what conclusions the original autopsies reached or otherwise introduced portions of those autopsies as facts. Although defendants could effectively cross-examine her on these points (e.g., "You have no idea if the autopsies are accurate, do you?"), the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." See Bullcoming, 564 U.S. at 62.

After this motion was briefed, the Government indicated that Dr. Pasquale-Styles's review was not limited to the original autopsy reports. Rather, Dr. Pasquale-Styles apparently reviewed the entirety of the medical examiner's file, which includes dozens of photographs, x-rays, and other documents created during the medical examiner's investigation. The Government further stated that Dr. Pasquale-Styles will not testify that she relied on or was influenced in any way by the initial autopsy reports. Whereas the conclusions of the autopsy reports are testimonial, photographs and X-rays taken in the course of a medical examiner's investigation are not. See, e.g., Altes v. Pennywell, No. 13-cv-04522, 2015 WL 3430315, at *5 (N.D. Cal. May 28, 2015) ("The accusatory opinions in this case, thus, were reached and conveyed not on the basis of the nontestifying pathologist's testimonial statements, but through

10

the testifying expert's independent assessment of photographs and other nontestimonial evidence.").

Therefore, subject to the Government laying an adequate foundation as to what Dr. Pasquale-Styles relied on in reaching her independent conclusions, and assuming she does not go beyond the Government's representations about her testimony, she will be permitted to testify.

**V.      Matthew Fleming**

Mr. Fleming intends to testify about the types of firearms that defendants allegedly used. In the initial disclosures regarding Mr. Fleming's testimony, the Government stated that he would testify about where the guns were manufactured, as that relates to the interstate nexus required to establish jurisdiction under federal laws regulating the use of firearms. Mr. Gillespie does not dispute that such testimony is appropriate. However, subsequent disclosures indicated that Mr. Fleming would also opine that the firearms in question are military-grade and have the capacity to carry more rounds than standard, non-military weapons, to which Mr. Gillespie objects.

The Government argues that this testimony is proper because these firearms are characteristic of the Bully Gang and therefore establish the relatedness of crimes using "similar methods of commission." The Government further argues that Bully Gang members' use of these specialized weapons speaks to the gang's sophistication and dangerousness, which is essential to telling the "complete story" of the enterprise. Given the other conduct that Mr. Gillespie and his co-defendants are charged with, the Government posits that the allegation they possessed dangerous and rare weapons will not create additional prejudice.

Because guns are specialized technology, expert testimony is appropriate to establish identity. For example, if there were a dispute about whether the guns used in a specific shooting

11

belonged to the Bully Gang, expert testimony about those guns' distinctive features (such as the shape and tip-color of their ammunition) would be necessary and helpful to show that Bully Gang members might have been involved in that shooting. And the fact that the Bully Gang purportedly used hard-to-find and particularly dangerous firearms is an important part of the Government's "complete story" of the enterprise. I agree with the Government that such testimony will not be unduly prejudicial given the backdrop of other admissible evidence.

Mr. Gillespie's motion is denied as to Mr. Fleming, who will be permitted to provide expert testimony about the jurisdictional nexus, issues pertaining to identity, and how these guns differ from other types of firearms.

**SO ORDERED.**

*Brian M. Cogan*
U.S.D.J.

Dated: Brooklyn, New York
       April 4, 2024